UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NATIONAL TRUST INSURANCE COMPANY,

       Plaintiff,

v.                              Case No.  8:11-cv-1437-T-33MAP

GRAHAM   BROTHERS   CONSTRUCTION
COMPANY,    INC.,    SPECIALIZED
SERVICES,  INC.,  LEN-VERANDAHS,
LLP, and TED GRAHAM,

       Defendants.
_____/

**ORDER**

    This cause is before the Court pursuant to Plaintiff National Trust Insurance Company's Motion for Summary Judgment on Plaintiff's Complaint and Defendant Len-Verandahs' Counterclaim (Doc. # 99), filed on September 14, 2012.  Len-Verandahs filed a response in opposition to the motion (Doc. # 115) on September 29, 2012.  Also before the Court is Len-Verandahs' Motion for Summary Judgment Against National Trust Insurance Company (Doc. # 108), filed on September 15, 2012. National Trust filed a Motion to Strike Len-Verandahs, LLP's Motion for Summary Judgment (Doc. # 109) on September 19, 2012, to which Len-Verandahs filed a response in opposition (Doc. # 110) on September 24, 2012.  National Trust filed a response in opposition to Len-Verandahs' Motion for Summary Judgment (Doc. # 112) on September 28, 2012.

    After due consideration, and for the reasons that follow, National Trust's motion for summary judgment is granted,

National Trust's motion to strike Len Verandah's summary judgment motion is granted, and Len Verandah's summary judgment motion is stricken.

I.   **Factual and Procedural Background**

National Trust issued a commercial general liability insurance policy, Policy No. CPP0004212, to defendant Graham Brothers Construction Company, Inc. for the period of November 1, 2004, to November 1, 2006 ("the Policy"). (Doc. # 6 at ¶ 9). Defendant Specialized Services, Inc. was added to the Policy as an insured in 2005. (Id. at ¶ 11).

In 2005, Specialized Services was awarded a contract with Len-Verandahs to perform site preparation work at a residential development project known as The Verandahs. (Id. at ¶ 13). Pursuant to the contract, Specialized Services was to perform removal of vegetation, deep clearing, grubbing, and preparation of pads for homesites. (Id. at ¶ 15). Specialized Services' affiliate company, Graham Brothers, performed much of the actual work. (Buzzell Dep. Doc. # 99-5 at 3). Robert Buzzell served as the project manager for Specialized Services, and Kris Graham, an employee of Graham Brothers, served as field superintendent on the project. (Id. at 2, 5).

In January of 2006, based on an inspection by Faulkner Engineering Services, Len-Verandahs discovered that

-2-

Specialized Services and Graham Brothers had buried organic material, including stumps and roots, on the lots instead of removing them, had used large clumps of clay from their excavation of ponds as part of the structural fill, and had placed excavated top soil, stumps and roots ("strippings") in the back of the project's lots. (Doc. # 99-15; Gregos Dep. Doc. # 99-6 at 3, 6-7).  Following the inspection, Faulkner Engineering's representative instructed Kris Graham not to bury the strippings on the lots, and Graham indicated that he understood he was not to bury this material on-site. (Gregos Dep. Doc. # 99-6 at 3, 6; Graham Dep. Doc. # 99-10 at 3-4).

However, at a second inspection in April 2006, Faulkner Engineering "observed the contractor placing fill containing roots on pads during the finish grading work" and "advised the contractor's field representatives to not place fill with significant roots on the pads." (Doc. # 99-18 at 1).  Faulkner Engineering inspected the project site again on May 8 through 11, 2006, and observed "consciously buried roots and trees in the back of lots." (Faulkner Dep. Doc. # 99-7 at 3).  Faulkner recommended that Specialized Services "root rake" the areas to remove unwanted roots and stumps from the project.  (Doc. # 99-15 at 3).  Specialized Services performed the remedial root rake work from May to August 2006 (Id. at 4-10), and

-3-

Specialized Services and Graham's work on the project was completed on August 2, 2006. (Cox Dep. Doc. # 99-8 at 3).

In October of 2006, buried roots were again discovered when one of the project's lots was being excavated for installation of a pool. (Doc. # 99-21; Doc. # 99-33 at 1). Len-Verandahs' parent company, Lennar Homes, notified Specialized Services of the problem on October 16, 2006 (Doc. # 99-21), and on December 20, 2006, requested Specialized Services to remediate the defective lots. (Doc. # 99-23). Specialized Services responded to the request by stating that "the root issue . . . has been addressed and taken care of by SSI in the months of June, July and early August with Faulkner Engineering present to verify the cleanup" (Doc. # 99-22), and that Specialized Services "has met the contract requirements for this project." (Doc. # 99-24 at 2).

Len-Verandahs informed Specialized Services on December 11, 2006, that it would remediate the lots itself and would hold Specialized Services liable for the remediation costs. (Doc. # 99-25 at 2-3). Len-Verandahs subsequently remediated the defective lots (Doc. # 99-26), and the project was completed in 2011. (Vevea Dep. Doc. # 99-34).

On May 27, 2008, Len-Verandahs filed suit in the Circuit Court for the Sixth Judicial Circuit in and for Pasco County,

-4-

Florida, against Specialized Services for breach of contract
and indemnification and against Ted Graham for negligence
related to the work done on the project. (Doc. # 6 at ¶ 13).
National Trust was not notified about the lawsuit until
September of 2009. (Ginn Dep. Doc. # 99-29 at 2). The court
entered an amended final judgment on September 9, 2010, in
favor of Len-Verandahs and against Specialized Services in the
amount of $1,956,355.37.  (Doc. # 99-42).

Len-Verandahs filed suit against Graham Brothers on July
19, 2010. (Doc. # 6 at ¶ 19).  Graham Brothers filed for
bankruptcy protection on October 5, 2011 (Doc. # 9), which
automatically stayed the case for a period of time.  Thus,
Len-Verandahs' lawsuit against Graham Brothers is still
pending.

National Trust initiated this declaratory judgment action
on August 10, 2010, in the United States District Court for
the Southern District of Georgia.  (Doc. # 1).  In its second
amended complaint, filed on August 24, 2010, National Trust
seeks a declaration that the Policy does not provide coverage
for the claims asserted by Len-Verandahs against Specialized
Services, Graham Brothers, and Ted Graham in the two
underlying lawsuits. (Doc. # 6 at ¶ 57).  Upon granting Len-
Verandahs' motion to transfer venue, the case was transferred

-5-

to this Court on June 29, 2011.  (Doc. ## 28-29).  On March 20, 2012, with leave of the Court, Len-Verandahs filed an amended answer to assert a counterclaim against National Trust.  (Doc. # 65).  The counterclaim contains one count for breach of contract regarding National Trust's alleged failure to pay the final judgment entered in the Specialized Services lawsuit and one count for declaratory judgment regarding Len-Verandahs' entitlement to recover damages sought in the pending Graham Brothers lawsuit. (Doc. # 65).

On August 1, 2012, the Court dismissed Specialized Services without prejudice pursuant to Federal Rule of Civil Procedure 4(m) because National Trust failed to serve Specialized Services with the summons and complaint within 120 days of filing the complaint. (Doc. # 89).  The Court likewise dismissed Ted Graham for the same reason on August 27, 2012. (Doc. # 93).

Now before the Court are National Trust's and Len-Verandahs' motions for summary judgment as to both National Trust's claims and Len-Verandahs' counterclaim, as well as National Trust's motion to strike Len-Verandahs' summary judgment motion as untimely filed.

II.  **Motion to Strike**

A district court is required to issue a scheduling order
that limits "the time to join other parties, amend the
pleadings, complete discovery, and file motions." Fed. R. Civ.
P. 16(b).  "This order controls the course of the action . .
." Fed. R. Civ. P. 16(d), and may be modified "only for good
cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).
"This good cause standard precludes modification unless the
schedule cannot 'be met despite the diligence of the party
seeking the extension.'" Sosa v. Airprint Sys., Inc., 133 F.3d
1417, 1418 (11th Cir. 1998) (quoting Fed. R. Civ. P. 16
advisory committee note).  A district court retains "broad
discretion in deciding . . . whether to consider untimely
motions for summary judgment." Enwonwu v. Fulton-Dekalb Hosp.
Auth., 286 F. App'x 586, 595 (11th Cir. 2008).

National Trust moves to strike Len-Verandahs' summary
judgment motion as untimely because it was filed on September
15, 2012, one day after the Court's deadline for filing
dispositive motions. (Doc. # 109).  National Trust points out
that the dispositive motions deadline was twice extended at
Len-Verandahs' request, yet Len-Verandahs was still unable to
meet the extended deadline and failed to request a third
extension of the deadline.  (Id. at 2). Len-Verandahs blames

the late filing of its motion on the fact that its counsel's daughter was sick and absent from daycare on the Tuesday and Wednesday of the week the motion was due on Friday, which caused counsel to work shorter hours than usual on those days to help out at home. (Doc. # 110 at 6).  Counsel states that he worked all day and night on Thursday and Friday in an attempt to complete the motion by the Friday deadline. (Id.).

Based on the fact that National Trust timely filed its summary judgment motion on September 14, 2012, National Trust argues that allowing the late-filed summary judgment motion would provide Len-Verandahs an unfair advantage because Len-Verandahs would have had an extra day to review National Trust's motion and tailor its own motion to address issues raised in National Trust's motion. (Doc. # 109 at 4). National Trust asserts that had Len-Verandahs requested an additional extension of time to file its motion, National Trust would similarly not have filed its motion until September 15, 2012, in order to prevent Len-Verandahs from having extra time to respond.  (Id.).

The Court finds that Len-Verandahs has failed to demonstrate good cause for the Court to consider its untimely summary judgment motion.  This Court entered an Amended Case Management and Scheduling Order on April 30, 2012, which set

-8-

September 4, 2012, as the deadline for filing dispositive motions. (Doc. # 74).  Upon Len-Verandahs' request, the deadline was extended to September 11, 2012 (Doc. # 96), and again subsequently to September 14, 2012. (Doc. # 98).  The only reason given for Len-Verandahs' failure to timely file its motion is that counsel's daughter was sick three days prior to the dispositive motion deadline, which caused counsel to work fewer hours on the Tuesday and Wednesday during the week the motion was due on Friday.

While the Court is not unsympathetic to the realities of caring for a sick child, such a reason, without more, is insufficient to establish that the deadline could not be met despite counsel's diligence, given that counsel had an additional week prior to his daughter's illness and several days afterwards in which to prepare Len-Verandahs' motion. Furthermore, once it became apparent that it would be unable to meet the deadline, Len-Verandahs did not request a third extension of the dispositive motions deadline or alert National Trust's counsel to the fact that its motion would be late, and Len-Verandahs provides no reason for its failure to do so.  The Court agrees with National Trust that allowing Len-Verandahs' late filed motion would provide Len-Verandahs

an undue advantage of being able to consider National Trust's timely-filed motion while drafting its own.

Absent good cause, "a party's lack of diligence and failure to notify the court of delays 'would render scheduling orders meaningless.'" <u>McClaney v. Macon Cnty. Bd. of Educ.</u>, No. 3:10-cv-219, 2011 WL 9015, at *2 (M.D. Ala. Jan. 3, 2011) (quoting <u>Sosa</u>, 133 F.3d at 1419).   Accordingly, the Court finds it appropriate to grant National Trust's motion to strike Len-Verandahs' summary judgment motion as untimely. Len-Verandahs' motion is hereby stricken from the record and will not be further considered by this Court.

**III.  <u>National Trust's Motion for Summary Judgment</u>**

     **A.  <u>Legal Standard</u>**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving

party.  <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742
(11th Cir. 1996)(citing <u>Hairston v. Gainesville Sun Publ'g
Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if
it may affect the outcome of the suit under the governing law.
<u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir.
1997).  The moving party bears the initial burden of showing
the court, by reference to materials on file, that there are
no genuine issues of material fact that should be decided at
trial.  <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256,
1260 (11th Cir. 2004)(citing <u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 323 (1986)).  "When a moving party has discharged
its burden, the non-moving party must then 'go beyond the
pleadings,' and by its own affidavits, or by 'depositions,
answers to interrogatories, and admissions on file,' designate
specific facts showing that there is a genuine issue for
trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-
94 (11th Cir. 1995)(citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations
or evidence, the non-moving party's evidence is presumed to be
true and all reasonable inferences must be drawn in the non-
moving party's favor.  <u>Shotz v. City of Plantation, Fla.</u>, 344
F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder
evaluating the evidence could draw more than one inference

-11-

from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

>    **B.   Choice of Law**

The parties disagree regarding whether Florida or Georgia substantive law applies in this case.  "A federal court sitting in diversity applies the choice of law rules of the forum state." AIG Premier Ins. Co. v. RLI Ins. Co., 812 F. Supp. 2d 1315, 1319 (M.D. Fla. 2011).  Therefore, the Court applies Florida choice of law rules to determine what law controls the substantive issues in this case.

In Florida, the *lex loci contractus* choice of law rule determines the law governing an insurance contract.  Id. Pursuant to this rule, "the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage." Rando v. Gov't Emp. Ins. Co., 556 F.3d 1173, 1176 (11th Cir. 2009) (quoting State Farm Mut. Auto. Ins. Co. v. Roach, 945 So. 2d 1160, 1163 (Fla. 2006)).

National Trust argues that Georgia law should apply "because the Policy was delivered to the Georgia insured at its principal office in Georgia." (Doc. # 99 at 8). The Court acknowledges that several courts have held that "the place where the contract was executed is 'generally considered to be the place where the policy is delivered.'" Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co., 165 F. Supp. 2d 1332, 1335 (S.D. Fla. 2001) (citations omitted); Mid-Continent Cas. Co. v. Basdeo, 742 F. Supp. 2d 1293, 1322 (S.D. 2010). However, other relevant cases have made clear that, while the place of delivery of the policy *may* be the place that the policy was deemed to be executed, it is not *necessarily* the place that the policy was executed. See AIG Premier Ins. Co., 812 F. Supp. 2d at 1319 ("The delivery of the policy can constitute the 'last act' necessary to execute a contract.").

Rather, as correctly noted by Len-Verandahs, "[t]he determination of where a contract was executed is fact-intensive and requires a determination of 'where the last act necessary to complete the contract was done.'" Id. (quoting Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc., 363 F.3d 1089, 1092-93 (11th Cir. 2004)). Len-Verandahs argues that the last act necessary to complete the contract is the

offeree's communication of acceptance to the offeror, which Len-Verandahs contends occurred in Florida. (Doc. # 115 at 2). Specifically, Len-Verandahs argues that after Graham Brothers' agent emailed National Trust with an offer to purchase insurance, stating "We got the formal order on this account. Please bind coverage effective 11/2/04" (Doc. # 118), National Trust accepted this offer by issuing the Policy from its office in Florida. (Parsons Dep. Doc. # 106 at 7).

The court in Granite State Ins. Co. v. American Building Materials, Inc., No. 8:10-cv-1542, 2011 WL 6025655, at *4 (M.D. Fla. Dec. 5, 2011), considered a similar factual situation, in which the insured's agent emailed the insurer's agent an offer to purchase the insurance at the prices quoted, by requesting that coverage be bound. Id. at *4. The insurer's agent then accepted that offer on behalf of the insurer and issued a binder for coverage from its offices in Massachusetts. Id. Based on these undisputed facts, the court concluded that "the final act necessary to form the insurance contract occurred when, from its office in Massachusetts, [the insurer's agent] accepted the offer from [the insured's] agent to purchase insurance by issuing the binder. Thus, Massachusetts law governs the interpretation of

-14-

the policies." <u>Id.</u> at *7. In so holding, the court
expressly:

> reject[ed] the [i]nsurer's contention that the last
> act occurred upon *receipt* of the binders and
> policies by [the insured's] agents in Florida,
> rather than the issuance of the same by [the
> insurer's agent] in Massachusetts. That argument
> conflicts with the firmly established contract
> principle that a written contract acceptance is
> effective at the time it is dispatched -- not when
> it is received by the offeror.

<u>Id.</u> at 5. (emphasis in original).

The Court finds that the similar facts presented in this
case require the same result as that reached by the court in
<u>Granite State</u>. The Court agrees with Len-Verandahs that the
last act necessary to complete the contract occurred in
Florida when National Trust accepted the agent's offer to bind
coverage by issuing the Policy. Thus, Florida law applies to
the substantive issues in this case.

## C.  <u>Analysis</u>

National Trust seeks a declaratory judgment ruling that,
pursuant to the terms of the Policy, it has no duty to defend
or indemnify Specialized Services or Graham Brothers in the
underlying lawsuits filed by Len-Verandahs. National Trust
also seeks summary judgment on Len-Verandahs' counterclaim for
breach of contract and declaratory judgment.

### 1.  <u>Duty to Defend and Indemnify</u>

-15-

"Florida courts have adopted a strict rule that an insurer's duty to defend an action against its insured is determined solely by the allegations in the complaint." <u>Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.</u>, 227 F. Supp. 2d 1248, 1258 (M.D. Fla. 2002)(citing <u>State Farm Fire & Cas. Co. v. CTC Dev. Corp.</u>, 720 So. 2d 1072, 1077 n.3 (Fla. 1998)). If a complaint contains allegations, some of which would be within the policy coverage and some of which are not, then the insurer has a duty to defend the entire case. <u>Id.</u> (citing <u>W. Am. Ins. Co. v. Silverman</u>, 378 So. 2d 28, 30 (Fla. 4th DCA 1979)). However, "if the complaint on its face does not allege a claim that is covered by an insurance policy but 'actual facts' developed in the discovery process or otherwise show that there is potential coverage under the insurance policy, the duty to defend is still not triggered." <u>Id.</u> (citing <u>Fed. Ins. Co. v. Applestein</u>, 377 So. 2d 229, 232 (Fla. 3d DCA 1979)).

"The duty to indemnify is narrower than the duty to defend, and there must be a determination that coverage exists before a duty to indemnify arises." <u>McCreary v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n</u>, 758 So. 2d 692, 695 (Fla. 4th DCA 1999)(citation omitted). "Thus, there is no duty to indemnify if there is no duty to defend."

-16-

<u>Allstate Ins. Co. v. Safer</u>, 317 F. Supp. 2d 1345, 1358 (M.D.
Fla. 2004).  In contrast to the duty to defend, the duty to
indemnify is not determined by reference to the claimant's
complaint, but rather by reference to the actual facts and
circumstances of the injury.  <u>Underwriters at Lloyds London v.
STD Enters.</u>, 395 F. Supp. 2d 1142, 1147 (M.D. Fla. 2005).
Additionally,

> insurance contracts are to be construed in a manner
> that is reasonable, practical, sensible, and just.
> . . . Terms used in a policy are given their plain
> and ordinary meaning and read in the light of the
> skill and experience of ordinary people.
> Provisions that exclude or limit liability of an
> insurer are construed more strictly than provisions
> that provide coverage.

<u>United States Fire Ins. Co. v. Freedom Vill. of Sun City Ctr.</u>,
279 F. App'x 879, 880-81 (11th Cir. 2008)(internal citations
omitted).  Furthermore, if provisions in an insurance contract
are "reasonably susceptible of more than one meaning, they are
ambiguous and construed in favor of the insured.  That rule
applies if a genuine inconsistency, uncertainty, or ambiguity
in meaning remains after a review of the plain language." <u>Id.</u>
at 881.

## 2.  **Insuring Agreement**

National Trust asserts that Len-Verandahs' claims against
Specialized Services and Graham Brothers do not trigger

-17-

coverage under the Policy's insuring agreement because there is no "property damage" caused by an "occurrence" during the Policy period, as is required to trigger coverage under the Policy.

The Policy's insuring agreement provides, in relevant part, as follows:

1.   Insuring Agreement

    a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

* * *

    b.   This insurance applies to "bodily injury" and "property damage" only if:

        (1)   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2)   The "bodily injury" or "property damage" occurs during the policy period;

* * *

(Doc. # 6-2 at 11).

-18-

The Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . or . . . "[l]oss of use of tangible property that is not physically injured." (Id. at 24-25). An "occurrence" is defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 24).

### i. **Specialized Services Lawsuit**

The Court agrees with National Trust that Len-Verandahs' underlying complaint against Specialized Services does not involve "property damage," as that term is defined by the Policy and interpreted under Florida law, and thus, coverage is not provided under the Policy's insuring agreement for Len-Verandahs' lawsuit against Specialized Services.

It is well-settled under Florida law that when damages in an underlying claim include only the costs associated with the repair, removal, and/or replacement of defective work without any allegations of physical injury to "some other tangible property," there is no "property damage" under the Policy, and therefore no coverage. See Auto-Owners Ins. Co. v. Pozzi Window Co., 984 So. 2d 1241, 1248 (Fla. 2008). In other words, "there is a difference between a claim for the costs of repairing or removing defective work, which is not a claim for

-19-

'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'" <u>United States Fire Ins. Co. v. J.S.U.B., Inc.</u>, 979 So. 2d 871, 889 (Fla. 2007).

Thus, the Court's analysis turns on the issue of whether the underlying complaints allege damages only for the cost of repairing the work performed by Specialized Services and Graham Brothers, or whether they include claims for repairing other property that suffered damage due to Specialized Services and Graham Brothers' faulty workmanship. The Court determines that the underlying complaint against Specialized Services and Ted Graham alleges a claim only for the repair and remediation of the faulty workmanship performed by Specialized Services, and does not include any allegations of damage to other property necessary to trigger coverage under the Policy.

The underlying complaint against Specialized Services alleges that pursuant to the contract between Specialized Services and Len-Verandahs, Specialized Services' "duties included, but were not limited to, removal of vegetation, deep clearing, grubbing, and preparing pads for homesites." (Doc. # 6-3 at ¶ 9). During the course of the project, Len-Verandahs "became aware that Specialized [Services] had

improperly buried various organic material including stumps and roots onsite, rather than remove these organics from the site" and requested Specialized Services to "remediate the faulty work by removing any unsuitable fill material from the site." (Id. at ¶¶ 10-11).   After Specialized Services completed the requested remediation work, "unsuitable organics were again discovered onsite," and Len-Verandahs notified Specialized Services and requested it to return to the site. (Id. at ¶¶ 13, 15).   However, Specialized Services was "unwilling to take responsibility and initiative *in fixing its own improper work*." (Id. at ¶ 15)(emphasis added).   Thus, "[d]ue to the ongoing problems with Specialized [Services'] work, Len-Verandahs was forced to conduct its own remediation, hire experts, and incur costs." (Id. at ¶ 16).   Len-Verandahs was also forced to buy back many of the lots it had sold to a purchaser, The Ryland Group. (Id. at ¶ 17).

In its breach of contract count, Len-Verandahs alleges that Specialized Services breached its contract by:

> failing to properly prepare the site, including the knowing burial of unsuitable organics, a portion of which had to be remediated by Len-Verandahs and for which testing and potential remedial work still must be performed for [the] remaining vacant lots to verify their suitability, and remediation as needed, prior to vertical construction. . . [;] refusing to test and remediate the remaining untested, vacant homesites[;] failing to cooperate

-21-

with Len-Verandahs in search for buried material .
. . [;] [and] charging Len-Verandahs for hauling
material offsite when . . . those charges were not
justifiable [because] Specialized [Services] did
not haul or burn organics, as invoiced, but rather
improperly buried material onsite.

(Id. at ¶¶ 24-25).

Based on these allegations, the Court finds that the
underlying complaint against Specialized Services alleges a
claim only for the costs associated with the repair, removal,
or replacement of the defective work performed by Specialized
Services, which does not constitute a claim for "property
damage" under the Policy.[1]

In its response to National Trust's summary judgment
motion, Len-Verandahs argues that the judgment entered in the
Specialized Services lawsuit also included damages for "the
impaired structural integrity and cracking of the slabs poured
and homes built on the defective lots." (Doc. # 115 at 4).[2]

_____

[1]     The Court acknowledges that the underlying complaint
also sought reimbursement for the amounts Len-Verandahs paid
The Ryland Group due to the rescission of Ryland's purchase
contract and the forced buyback of many of the affected
homesites.  However, the Court finds that Ryland's rescission
of its purchases does not constitute "physical injury to some
other tangible property," and thus, does not constitute a
claim for "property damage" under the Policy.

[2]     Interestingly, as pointed out by National Trust, the
final judgment states that Len-Verandahs "suffered the
following recoverable loss in direct damages *required to*
                                              (continued...)

-22-

However, as detailed above, the underlying complaint does not contain any allegations of such "impaired structural integrity" or "cracking of slabs poured and homes built" on the defective lots, but rather, describes only the deficiencies in Specialized Services' work and the costs Len-Verandahs incurred to remediate that faulty workmanship. Nowhere does the underlying complaint allege that Specialized Services' faulty workmanship caused physical damage to other property, as required to state a claim for "property damage" under the Policy.

Accordingly, given that an insurer's duty to defend is determined solely by the allegations in the underlying complaint, the Court finds that National Trust had no duty to defend Specialized Services in the underlying lawsuit against it because the underlying complaint does not allege any "property damage" that would be covered by the Policy's insuring agreement.  Furthermore, because National Trust had

---

[2](...continued)
*remediate work performed under the contract* - $2,102,463.83" and that "[t]here were no other recoverable collateral damages proven."  (Doc. # 99-42 at ¶¶ 3, 5)(emphasis added).  Thus, the final judgment itself does not even support Len-Verandahs' contention that the underlying judgment against Specialized Services included costs incurred for physical damage to other property in addition to the costs for the remediation of Specialized Services' own faulty workmanship.

no duty to defend Specialized Services in the underlying lawsuit, National Trust also has no duty to indemnify Specialized Services for the judgment entered against it in the underlying lawsuit. See Safer, 317 F. Supp. 2d at 1358 ("[T]here is no duty to indemnify if there is no duty to defend."). Thus, the Court grants summary judgment in National Trust's favor on its declaratory judgment complaint regarding coverage for the Specialized Services lawsuit.

### ii. Graham Brothers Lawsuit

Unlike the underlying complaint against Specialized Services, the complaint filed by Len-Verandahs against Graham Brothers does allege damages to other property beyond just the costs of remediating Graham Brothers' faulty workmanship. For example, the Graham Brothers complaint alleges that "[s]ubsequent to the construction of homes and Ryland's subsequent testing and investigation, Ryland concluded the lots contained unsuitable soils and buried roots, stumps and large amounts of organic material and various wood and organic debris" and that "Len-Verandahs was obligated to compensate Ryland for the costs it incurred in stabilizing the homes . . . ." (Doc. # 6-4 at ¶¶ 12, 13). Len-Verandahs further alleges that it incurred damages including "[a]mounts Len-Verandahs paid Ryland in reimbursement for expenses Ryland incurred in

-24-

investigating the condition of the home sites, engineering a plan to remediate the subsurface soil conditions, *underpinning the foundations of certain homes*, and all the associated costs." (Id. at ¶ 17).

Based on these allegations which include damages beyond just remediation of Graham Brothers' own work, including the costs of "stabilizing the homes" and "underpinning the foundations of certain homes," the Court finds that the complaint against Graham Brothers sufficiently alleges "property damage," as the term is defined by the Policy, to trigger coverage under the Policy's insuring agreement.

Additionally, the Court finds that Graham Brothers' actions in improperly burying various organic materials including stumps and roots onsite, though evidently intentional, may still constitute an "occurrence" under the Policy's insuring agreement. Several Florida courts have interpreted the Policy's definition of "occurrence," defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" (Doc. # 6-2 at 24), to include not only "'accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured." J.S.U.B., Inc., 979 So. 2d at 883 (quoting State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720

So. 2d 1072, 1076 (Fla. 1998)).   There is nothing in the Graham Brothers' underlying complaint, nor any other evidence on record, suggesting that Graham Brothers actually intended for its actions to cause cracks and structural damage to the foundations of the homes that were subsequently built on the sites Graham Brothers improperly cleared.   Accordingly, the Court finds that Graham Brothers' actions, although intentional, could constitute an "occurrence" under the Policy, and thus, the allegations in the underlying complaint against Graham Brothers fairly bring the claim within the Policy's insuring agreement.

### 3.   <u>Late Notice Defense</u>

Having found that National Trust has no duty to defend or indemnify Specialized Services in the lawsuit brought against it by Len-Verandahs, the Court need not determine whether any of the many Policy exclusions or coverage defenses National Trust asserts apply to Specialized Services.   Thus, the Court will consider such issues only in regard to the Graham Brothers lawsuit.

Specifically, National Trust argues that coverage is precluded for the Graham Brothers lawsuit due to Graham Brothers' failure to give timely notice of Len-Verandahs'

claim or the alleged occurrence giving rise to Len-Verandahs' claim. (Doc. # 99 at 22). The Court agrees.

Under Florida law, an insured's failure to provide "timely notice of loss in contravention of a policy provision is a legal basis for the denial of recovery under the policy." Ideal Mut. Ins. Co. v. Waldrep, 400 So. 2d 782, 785 (Fla. 3d DCA 1981). Most Florida cases treat the issue in a two step manner, in which consideration must first be given to whether the insured's notice was untimely. Id.; Laster v. United States Fid. & Guar. Co., 293 So. 2d 83, 86 (Fla. 3d DCA 1974). If so, then a presumption of prejudice to the insurer arises, and "the insured can only prevail by rebutting the presumption and demonstrating that no prejudice in fact occurred." Clena Invs., Inc. v. XL Specialty Ins. Co., No. 10-cv-62028, 2012 WL 1004851, at *4 (S.D. Fla. Mar. 26, 2012)(citations omitted). "The insured's burden is to show by competent evidence that the insurer has not been substantially prejudiced by the lack of notice or the untimely notice." Id. (citations omitted).

In this case, as a condition to coverage, the Policy requires, in pertinent part, as follows:

> 2.  Duties In the Event of Occurrence, Offense, Claim or Suit
>
>     a.  You must see to it that we are notified as soon as practicable of an "occurrence"

or an offense which may result in a
claim.  To the extent possible, notice
should include:

(1)   How, when and where the "occurrence"
      or offense took place;

(2)   The names and addresses of any
      injured persons and witnesses; and

(3)   The nature and location of any
      injury or damage arising out of the
      "occurrence" or offense.

b.   If a claim is made or "suit" is brought
     against any insured, you must:

(1)   Immediately record the specifics of
      the claim or "suit" and the date
      received; and

(2)   Notify us as soon as practicable.

You must see to it that we receive
written notice of the claim or "suit" as
soon as practicable.

c.   You and any other involved insured must:

(1)   Immediately send us copies of any
      demands, notices, summonses or legal
      papers received in connection with
      the claim or "suit";

(2)   Authorize us to obtain records and
      other information;

(3)   Cooperate with us in the
      investigation or settlement of the
      claim or defense against the "suit";
      and

(4)   Assist us, upon our request, in the
      enforcement of any right against any
      person or organization which may be

-28-

> liable to the insured because of
> injury or damage to which this
> insurance may also apply.

                    * * *

(Doc. # 6-2 at 20).

Under Florida law, "[a] policy provision relating to the time when notice of an [occurrence] must be given, and containing language such as, 'as soon as practicable,' means notice given with reasonable dispatch and within a reasonable time in view of all the facts and circumstances of the particular case."  Laster, 293 So. 2d at 86 (citation omitted).  Thus, in many cases, whether notice is timely will be a question of fact for the jury. Clena Invs., Inc., 2012 WL 1004851, at *4.  However, in cases where the undisputed factual record establishes notice is so late that no reasonable juror could find it timely, Florida courts will deem the notice untimely as a matter of law. Id. (four-year delay untimely as a matter of law); Midland Nat'l Ins. Co. v. Watson, 188 So. 2d 403, 405 (Fla. 3d DCA 1966) (two-year delay untimely as a matter of law).

In this case, the evidence shows that Kris Graham, representative of Graham Brothers, was present at the project site when the buried strippings were first discovered in January 2006, and he was instructed at that time not to bury

                    -29-

any more strippings on the lots. (Gregos Dep. Doc. # 99-6 at 3, 6; Graham Dep. Doc. # 99-10 at 3-4).   Furthermore, two other insurers sent Graham Brothers letters in April 2007 (Doc. # 99-27), and  July 2007 (Doc. # 99-36), informing it that the insurers were investigating Len-Verandahs' claims. There is also evidence that "Specialized Services and Graham Brothers . . . functioned as one company with [Specialized Services] as the general contractor, project management team and Graham Brothers as the heavy dirt movers," (Buzzeell Dep. Doc. # 114 at 4), such that knowledge of Len-Verandahs' claims communicated in Len-Verandahs' many letters to Specialized Services could be imputed to Graham Brothers.   The first of these letters was sent on October 16, 2006. (Doc. # 112-21).

However, despite Graham Brothers' knowledge in 2006 of the events giving rise to Len-Verandahs' claims, National Trust did not learn of Len-Verandahs' claims until July 20, 2009, when National Trust received a letter from Len-Verandahs requesting Graham Brothers' insurance information.  According to National Trust, Graham Brothers itself did not provide any notice of the claim to National Trust until after Len-Verandahs filed suit against Graham Brothers in July 2010, and "has offered no excuse for this delay." (Doc. # 99).

The Court finds Graham Brothers' notice to National Trust untimely as a matter of law. Graham Brothers waited approximately four years before providing any notice to National Trust.   Florida courts have found much shorter periods untimely as a matter of law. Kroener v. Fla. Ins. Guar. Ass'n, 63 So. 3d 914, 916 (Fla. 4th DCA 2011)(two years untimely as a matter of law); Ideal Mut. Ins. Co., 400 So. 2d at 785 (two months untimely as a matter of law).

As explained above, under the relevant Policy provision, "notice is necessary when there has been an occurrence that should lead a reasonable and prudent man to believe that a claim for damages would arise." Ideal Mut. Ins. Co., 400 So. 2d at 785.  Given that Len-Verandahs advised the parties of its claim in October of 2006, Graham Brothers knew of the claim and potential lawsuit against it well before Len-Verandahs filed suit in July of 2010, and should have notified National Trust at that time.  Furthermore, the record evidence does not reflect any reason provided by Graham Brothers for the delay. The Court need not pinpoint exactly when Graham Brothers' duty to notify National Trust arose.  Suffice it to say, four years was simply too late, and under the circumstances of this case, no rational juror could find that

Graham Brothers' notice to National Trust, coming approximately four years after the "occurrence," was timely.

Thus, a presumption of prejudice to National Trust arises which Len-Verandahs must rebut in order to prevail. "That is, in order to avoid summary judgment, [Len-Verandahs] must put forth competent evidence creating a disputed issue of fact as to whether [National Trust] was in fact prejudiced or not." Clena Invs., Inc., 2012 WL 1004851, at *6. Len-Verandahs has not done so here.

"An insurer is prejudiced by untimely notice when the underlying purpose of the notice requirement was frustrated by the late notice." Kendall Lakes Towers Condo. Ass'n, Inc. v. Pacific Ins. Co., Ltd., No. 10-24310, 2012 WL 266438, at *4 (S.D. Fla. Jan. 30, 2012)(internal quotations omitted). "Thus, prejudice to the insurer results if the untimely notice substantially disadvantages this insurer's ability to (1) investigate a claim, (2) defend a claim, (3) or to mitigate damages through settlement or early repairs." Id.

The evidence shows that National Trust was not provided notice of the potential claim when it first arose in 2006, and Graham Brothers' work was remediated by Len-Verandahs in 2007. (Doc. # 99-26). Thus, National Trust was unable to inspect the project site prior to the remediation to determine

the extent of the potential "property damage" actually caused by Graham Brothers' faulty workmanship.  Furthermore, because the lots were repaired by Len-Verandahs and repurchased from Ryland well before National Trust was provided any notice of the occurrence, the late notice may have "disadvantage[d] the insurer's ability to mitigate damages through settlement or early repairs."  Clena Invs., Inc., 2012 WL 1004851, at *6.

Len-Verandahs does not present any evidence in an attempt to demonstrate that National Trust did not suffer prejudice in regards to the lawsuit against Graham Brothers.  Instead, Len-Verandahs' arguments relate only to its lawsuit against Specialized Services and consist merely of assertions that National Trust "had plenty of time to investigate the claims and defend [Specialized Services] or otherwise intervene in the [Specialized Services] lawsuit before judgment was entered against [Specialized Services]."  (Doc. # 115 at 17).  The Court finds this argument, without more, does not present competent evidence sufficient to create a disputed issue of fact as to whether National Trust suffered prejudice in regards to the Graham Brothers lawsuit.

The remainder of Len-Verandahs' argument on this issue focuses on Len-Verandahs' contention that National Trust is estopped from asserting late notice as a coverage defense due

to National Trust alleged noncompliance with Florida's Claims
Administration Statute, Section 627.426(2), Florida Statutes.
Section 627.426(2)(a), Florida Statutes, provides:

> A liability insurer shall not be permitted to deny
> coverage based on a particular coverage defense
> unless . . . [w]ithin 30 days after the liability
> insurer knew or should have known of the coverage
> defense, written notice of reservation of rights to
> assert a coverage defense is given to the named
> insured . . . .

Section 627.426(2)(a), Florida Statutes.

Len-Verandahs contends that National Trust failed to
comply with this statute because National Trust "knew or
should have known of the coverage defense by September 14,
2009, at the latest . . . . However, [National Trust] first
raised this defense in a written reservation of rights letter
to [Specialized Services] and [Graham Brothers] dated December
2, 2009," more than 30 days after National Trust should have
known of the coverage defense. (Doc. # 115 at 16-17).

While Len-Verandahs appears correct that National Trust
did not provide notice of this coverage defense within 30 days
of learning of the defense, the Court finds that National
Trust was not required to comply with this statutory
provision.  Indeed, Section 627.401(2), Florida Statutes,
specifically provides that "No provision of this part of this
chapter applies to: (2) Policies or contracts not issued for

-34-

delivery in this state nor delivered in this state, except as otherwise provided in this code." As discussed above, the Policy was *executed* in Florida because the last act necessary to complete the contract occurred in Florida, such that Florida law applies to the interpretation of the Policy. However, the evidence shows that the Policy was not *issued for delivery* in Florida, nor was it actually delivered in Florida, but rather was issued for delivery and personally delivered to Graham Brothers at its office in Georgia. (Leachman Aff. Doc. # 99-43 at ¶¶ 11, 13). Accordingly, Section 627.401(2) removes the Policy from the requirements of the Claims Administration Statute, Section 627.426(2), and thus, National Trust is not estopped from asserting its late notice defense. See Sheeran v. Lumbermens Mut. Cas. Co., 504 So.2d 776, 778 (Fla. 1st DCA 1987)("[S]ection 627.401(2). . . limits the applicability of [Section 627.4135] to policies issued for delivery or delivered in the state.").

Len-Verandahs has not supplied any evidence to rebut the presumption that National Trust was prejudiced due to Graham Brothers' four-year delay in providing notice to National Trust of Len-Verandahs' claims. Thus, due to Graham Brothers' failure to comply with the Policy's notice conditions, coverage for Len-Verandahs' lawsuit against Graham Brothers is

precluded and National Trust is entitled to summary judgment in its favor. Accordingly, the Court need not analyze whether the many Policy exclusions National Trust cites would also operate to preclude coverage for Len-Verandahs' lawsuit against Graham Brothers.

### 4.   **Len-Verandahs' Counterclaims**

National Trust also moves for summary judgment on Len-Verandahs' two counterclaims against it.   Len-Verandahs asserts one count for breach of contract regarding National Trust's alleged failure to pay the final judgment entered in the Specialized Services lawsuit and one count for declaratory judgment regarding Len-Verandahs' entitlement to recover damages sought in the pending Graham Brothers lawsuit. (Doc. # 65).   The Court finds that National Trust is entitled to summary judgment on both counts.

Regarding Len-Verandahs' lawsuit against Specialized Services, Len-Verandahs argues that it is entitled to recover from National Trust the amended judgment entered against Specialized Services, as a third-party claimant or, alternatively, as an additional insured under the Policy. (Doc. # 65 at 12).   As explained above, the Court has determined that the allegations in the underlying complaint do not allege a claim for "property damage" covered under the

-36-

Policy's insuring agreement, and thus, National Trust has no duty to defend or indemnify Specialized Services for its liability incurred in the lawsuit. Accordingly, Len-Verandahs is not entitled to recover the amended judgment as a third-party beneficiary from National Trust, and National Trust did not breach the Policy by failing to pay Len-Verandahs' claims in the Specialized Services lawsuit.

Regarding Len-Verandahs' pending lawsuit against Graham Brothers, for the reasons explained above, any potential coverage under the Policy is precluded by Graham Brothers' prejudicial untimely notice of the claim. Thus, Len-Verandahs is not entitled to recover as a third-party claimant under the Policy in the event that judgment is ultimately entered against Graham Brothers.

Finally, Len-Verandahs seeks to recover the damages sought in the Specialized Services lawsuit and the Graham Brothers lawsuit as an additional insured under the Policy. National Trust contests whether Len-Verandahs constitutes an additional insured under the Policy, but argues that:

> Even if Len did qualify as an additional insured, this status is wholly irrelevant to National Trust's alleged duty to pay Len's judgment against [Specialized Services].  Under the Policy, an insured is entitled to indemnification for payment of judgments *against* the insured.  The insuring agreement states, "[w]e will pay those sums that

the insured becomes legally obligated to pay as
damages . . ." Here, Len is not seeking payment of
a judgment that Len, as a supposed additional
insured, is legally obligated to pay. Instead, Len
contends that it is an additional insured, and as
such National Trust should pay a judgment another
entity [Specialized Services] is legally obligated
to pay to Len. The Policy's insuring agreement
clearly does not cover payments of a judgment in
favor of a purported insured.

(Doc. # 99)(emphasis in original).

The Court agrees with National Trust that if Len-
Verandahs qualifies as an additional insured -- and the Court
need not make such determination here -- the Policy's insuring
agreement would provide coverage only for those sums that Len-
Verandahs becomes legally obligated to pay, not those sums
that another insured is legally obligated to pay to Len-
Verandahs. Thus, Len-Verandahs cannot recover as an
additional insured the final judgment entered against
Specialized Services or the damages presently sought from
Graham Brothers.

To the extent that Len-Verandahs argues that a portion of
such damages is recoverable liability Len-Verandahs incurred
in connection with its repurchase of lots from Ryland, the
Court agrees with National Trust that there is no evidence
that Len-Verandahs has ever presented a claim to National
Trust for such liability. The Court also agrees that if Len-

-38-

Verandahs had made such a claim, the claim would likely be barred by the Policy's prohibition on voluntary payments given that there is no evidence that Len-Verandahs was legally obligated to buy back the lots from Ryland and did not do so voluntarily.[3]   Accordingly, National Trust is entitled to summary judgment in its favor on both counts of Len-Verandahs' counterclaim.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   National Trust's Motion to Strike Len-Verandahs, LLP's Motion for Summary Judgment (Doc. # 109) is **GRANTED.** Len-Verandahs' Motion for Summary Judgment Against National Trust Insurance Company (Doc. # 108) is **STRICKEN.**

(2)   National Trust's Motion for Summary Judgment on Plaintiff's Complaint and Defendant Len-Verandahs' Counterclaim (Doc. # 99) is **GRANTED.**

---

[3]      The Policy provides that "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." (Doc. # 6-2 at 20).   For the reasons explained above regarding National Trust's late notice defense, the Florida Claims Administration Statute would also not apply to prevent National Trust from asserting this provision as a coverage defense.

(3)   The Clerk is directed to enter judgment in favor of
      Plaintiff and against Defendants and thereafter close
      this case.

      **DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>4th</u>
day of January, 2013.

                                    VIRGINIA M. HERNANDEZ COVINGTON
                                      UNITED STATES DISTRICT JUDGE


Copies: All Counsel of Record